UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

| | |
|---|---|
| MAMA BEARS OF FORSYTH COUNTY, et al., <br><br> *Plaintiffs,* <br><br> v. <br><br> WESLEY MCCALL, et al., <br><br> *Defendants.* | Case No. 22-cv-00142-RWS |

PLAINTIFFS'
POST-HEARING MEMORANDUM

In addition to evidence and argument referenced in Plaintiffs' pre-hearing briefing and presented at the hearing on February 20, 2022, Plaintiffs offer the following additional authority and argument in support of their motion for preliminary injunction.

I. THE MAMA BEARS HAVE STANDING TO MOUNT A PRE-ENFORCEMENT AS-APPLIED CHALLENGE TO THE REVISED PUBLIC PARTICIPATION POLICY

A. Legal standard for pre-enforcement standing

As has already been explicated in prior briefing and at the preliminary injunction hearing, Plaintiffs' speech was originally restricted under FCS's Public Participation Policy as it existed at the time of the original filing of this case, but that policy was slated for amendment after this litigation started. On June 16, 2022, Plaintiffs filed an Amended Complaint challenging the new policy and rules, as well as the then-existing policy. ECF No. 27. The new Policy and rules (collectively "new Policy"), as set forth in ECF Nos. 24-3, 24-3 and 25-3, were adopted by the FCS Board on February 20, 2022, shortly after the preliminary injunction hearing, and now apply to public comments. ECF No. 30 at 1.

Defendants have stipulated that had the new Policy been in force in February and March 2022, it would have been applied to restrict the verbatim reading of the sexually explicit books at issue, and also to exclude Alison Hair from future board meetings. *Id.* at 1-2. At a minimum, the restriction on "profane" speech would have applied, but other provisions might have applied as well. *Id.*

In addition, it is well-established that the Mama Bears have standing to bring an as-applied pre-enforcement challenge to the new Policy because their speech is objectively chilled by the new policy. *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1120 (11th Cir. 2022). Importantly, the revised Policy need not have been enforced or applied to the Mama Bears in order for them to have standing to challenge it. *Id.*

The Eleventh Circuit recently clarified in *Speech First* that its standing doctrine is more permissive in the First Amendment context. In other as-applied, pre-enforcement contexts, courts in this circuit ask whether (1) the plaintiff was threatened with enforcement; (2) enforcement is likely; or (3) there is a credible threat of enforcement. *See, e.g., McDonald v. City of Pompano Beach,* 556 F. Supp. 3d 1334, 1345-46 (S.D. Fla. 2021) (applying the credible-threat standard in the First Amendment context, pre-*Speech First).*

Under either an objective-chill or credible-threat test, the Mama Bears have standing to challenge the new Policy because (1) it is undisputed that it would be applied to prevent them from reading from the books verbatim as "profane" speech; (2) Defendants' admission that other new Policy terms might apply creates an objective chill; (3) Defendants have already argued that Plaintiffs' past speech was "abusive" and included "shouting" and "screaming;" and (4) at

3

least one Mama Bears member is experiencing ongoing exclusion for her speech.

### B. Defendants have already prevented Mama Bears from quoting the books verbatim and would do so again

The central theme of Defendants' argument is that their speech restrictions were justified because there is no right to read out loud sexually explicit passages from a book during public comments. ECF No. 17 at 1. As per the Joint Stipulation, it is undisputed that the new Policy would be utilized to suppress the Mama Bears' speech if they attempted to read from the books during public comment again. ECF No. 30 at 1-2. This creates both an objective chill and credible threat of enforcement.

### C. Defendants have already described Alison Hair as "screaming" and "yelling," indicating an intent to apply the loud-and-boisterous speech restriction

At the preliminary injunction hearing, the Court expressed some concern about the state of the record as to an as-applied challenge to the "loud and boisterous" component of the civility provision. But Defendants have already made arguments indicating that they considered Ms. Hair's February and March 2022 speeches to have violated this new provision.

In their MPI response, Defendants described her February speech as follows: "…Plaintiff Hair, in a raised voice, at times screaming, vociferously

4

*criticized* the School District for allowing certain books in school libraries." ECF No. 17 at 3 (emphasis in original). They similarly described her March speech as follows: "…Plaintiff Hair raised her hand, *yelled* out 'Don't Even' and continued to read… After more *yelling* by her and others in the audience, McCall called for recess…." ECF No. 17 at 6 (emphasis added).

Of course, Defendants' description of Hair as "yelling" and "screaming" is not fair, evoking images that differ markedly from those captured on video submitted in the record. Plaintiffs "are happy to allow the videotape to speak for itself." *Scott v. Harris*, 550 U.S. 372, 378 n.5 (2007). Hair was upset, but so are many people who come before their elected officials "to petition the government for a redress of grievances." U.S. Const. amend. I. That is especially true when their children are involved.

Defendants' choice of language foreshadows that they intend to apply the "loud and boisterous" component against future speech that is like Alison Hair's past speech; that is, speech by their most pointed critics, on issues that (understandably) evoke passion. But the First Amendment reflects "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times v. Sullivan*, 376 U.S. 254, 270 (1964).

5

Hair's speech at all times fell well-within these confines. She raised her voice at times, but only due to the presence of sound amplification and her attempting to prevent Wes McCall from speaking over her and suppressing her speech. She did not disturb the meeting, but rather played her natural, constitutionally expected role in it. She also did not interrupt other speakers or exceed her time limits.

> D. Defendants have already called Plaintiffs' past comments to them "abusive," indicating an intent to apply the abusive-speech restriction

Much like the "loud and boisterous" provision, Defendants have already argued that Plaintiffs, and others, were "abusive" toward Defendants during the February and March 2022 board meetings. They described Ms. Hair's February speech as follows: "…[Hair] stated she was there 'to confront evil' and proceeded to accuse Board members with unfounded accusations." Similarly, Defendants described some of the eight speakers who preceded Hair as "extremely critical" of the board: "including implying that they are evil and one speaker even suggested that they were 'pedophiles' for allowing the books objected by the Plaintiffs." ECF No. 17 at 5.

Later in their response brief, Defendants explicitly argue that "a simple viewing of the videos reveals that the Plaintiffs and other speakers *were*

*'abusive'* or directed personal comments and criticism of the Superintendent or an individual Board member…" *Id.* at 10 (emphasis added). Defendants seek to take credit for not restricting such criticism at the February and March meetings, but it would be objectively reasonable for a speaker to infer that if a Board adopts a policy prohibiting "abusive" comments after they feel they have been abusively criticized, that Board intends to apply the policy to restrict similar pointed criticism in the future.

E. Defendants already banned Alison Hair for making comments that were deemed "not civil"

Some discussion at the preliminary injunction hearing concerned whether "civil" comments were a free-standing requirement or a collective term for all of the restrictions listed under the previous and current civility clauses. *See* ECF No. 24-3 at 2 (¶ 9: "Speakers are asked to keep their remarks civil."); ECF No. 2-6 at 2 (¶ 8: same).

The fact that a debate surrounds that issue illustrates that *both* policies are vague and fail to give proper notice or contain sufficient guidelines to limit discretion. And it is undisputed that the previous Policy has already been used to ban Alison Hair from attending board meetings because the Board determined that "your remarks were not civil." ECF No. 2-5 at 2. Moreover, she remains banned under the new Policy, which means that the civility

7

provision is *already* being enforced against her. Thus, for standing purposes, the Mama Bears have both an objective chill as to future speech and the experience of actual enforcement against one of their members under both the previous and current Policy. For Article III purposes, they have the right to challenge the new Policy, even if some specific provisions have yet to be applied to their speech in real time.

II. NON-OBSCENE SEXUAL SPEECH THAT ADVANCES A POLITICAL OR PHILOSOPHICAL VIEWPOINT IS PROTECTED SPEECH EVEN IF SOME MIGHT LABEL IT PROFANE

   A. The books that Mama Bears wish to read from are not legally obscene

During the hearing, Defense counsel vacillated as to whether the passages the Mama Bears sought to read were legally obscene or not. Plaintiffs have consistently maintained that their intended speech is not obscene and have cited to both *McBreairty v. Sch. Bd. of RSU22*, No. 1:22-cv-00206-NT, 2022 U.S. Dist. LEXIS 128353, at *14-15 (D. Me. July 20, 2022) and the controlling test from *Miller v. California*, 413 U.S. 15, 36 (1973).

To date, Plaintiffs have focused on the last prong of the *Miller* test and emphasized that their use of the primary-source material is not obscene because it is designed to make a serious political or philosophical point about the availability of such materials in FCS libraries. Indeed, it is much like the

8

point Mr. McBreairty was making in his non-obscene public comment before a Maine school board, or like the Plaintiffs were making in *Rubin v. Young,* 373 F. Supp. 3d 1347, 1351-53 (N.D. Ga. 2019), when they sought to wear non-obscene buttons with the slogan "Don't Fuck With Us[,] Don't Fuck Without Us" at the Georgia state capitol, in support of Planned Parenthood.

But as this Court also noted in *Rubin,* 373 F. Supp. 3d at 1352 (quoting *Luke Records, Inc. v. Navarro*, 960 F.2d 134, 136 (11th Cir. 1992)), a work cannot be held obscene unless each element of the test has been evaluated and all three have been met. Thus, if Defendants wish to change their mind yet again, and now allege that Mama Bears' quoting from the books was obscene, they should bear the burden of showing that all three prongs of the *Miller* test are met, including that (1) that the quoted passages, applying contemporary community standards and taken as a whole, appeal to the prurient interest; and (2) that the material they seek to proscribe is patently offensive sexual conduct "specifically defined by the applicable state law." *Id.; see also Reno v. ACLU,* 521 U.S. 844, 873 (1997) (finding that the CDA omitted the critical second prong of the *Miller* test). Defendants have not proven any of these elements, including identifying where these excerpts are identified as "patently offensive sexual conduct" in Georgia state law. And the fact that they keep changing their minds about whether the quoted texts are "obscene"

9

demonstrates that the revised Policy is vague. So vague that even defense counsel does not know whether the obscenity bar applies here.

B. There is no fixed legal definition of profane

At the hearing, one issue the Court asked for more briefing on was the definition of "profane" speech. Plaintiffs' counsel have researched the issue and have not found a widely accepted definition of "profane" speech. To the extent the category remains undefined, that, in itself, presents vagueness and unbounded-discretion concerns.

In his opinion, concurring in part and dissenting in part, in *Iancu v. Brunetti*, 139 S. Ct. 2294, 2307 (2019), Justice Breyer discussed "vulgar" words and how their meaning has changed over time: "the list has evolved away from words of religious disrespect and toward words that are sexually explicit or that crudely describe bodily functions." And they may evolve further. *Id*. But that is not a definition of "profane" that suffices to give legal notice or guide discretion, but an invitation to describe as "vulgar" whatever a majority somewhere in some community now finds distasteful. For example, calling someone a "groomer" or an "insurrectionist."

Perhaps the closest thing to a working definition of "profane" was the Fifth Circuit's explanation in *United States v. Hicks*, 980 F.2d 963, 970 n.99 (5th Cir. 1992):

> By "profanity" or "vulgarity," we refer to words that, *while not obscene*, nevertheless are considered generally offensive by contemporary community standards. *Cf. FCC v. Pacifica Foundation*, 438 U.S. at 741 (discussing humorist George Carlin's "Filthy Words" monologue as qualifying as "indecent" or "profane" language). We note that such words usually refer to "offensive sexual or excretory speech." *Id.* at 743. We also believe that certain other language, at least when used in certain contexts, qualifies as profanity. For instance, with reference to the instant case, we believe that Appellant Canty's angry reference to Ms. Bott as a "bitch" and Appellant Moore's angry admonition that Ms. Bott should get her "ass" to the plane's kitchen qualified as profane.

*Id.* (emphasis added).

In *Pacifica,* while the Supreme Court narrowly upheld the FCC's right to regulate "obscene, indecent, or profane" language in radio broadcasts to captive audiences, the Court did not define "profane." 438 U.S. at 731.[1]

---

[1] The Supreme Court also noted that "If there were any reason to believe that the Commission's characterization of the Carlin monologue as offensive could be traced to its political content -- or even to the fact that it satirized contemporary attitudes about four-letter words -- First Amendment protection might be required." *Pacifica,* 438 U.S. at 746. *Pacifica* has also been narrowly limited to its facts—broadcast radio communications. *Reno,*

11

Thus, perhaps at-best one can say that profanity includes non-obscene speech, that is nevertheless offensive to some. But such speech is without question subject to First Amendment protection. *Sable Commc'ns of Cal. v. FCC*, 492 U.S. 115, 126 (1989) ("Sexual expression which is indecent but not obscene is protected by the First Amendment."); *Reno,* 521 U.S. at 874-75 (quoting *Sable); Rubin,* 373 F. Supp. 3d at 1353 (same); *Davidson v. Time Warner*, No. V-94-006, 1997 U.S. Dist. LEXIS 21559, at *59-60 (S.D. Tex. Mar. 28, 1997) (*2Pacalypse Now* lyrics rife with profanity not rising to the level of fighting words or obscenity were protected speech).

Thus, the baseline presumption is that whatever "profane" means it is something different than obscene speech and thus it is entitled to First Amendment protection. As a result, the government must show that it has a sufficient legal basis to restrict such speech. *See, e.g., Ala. Democratic Conference v. AG,* 838 F.3d 1057, 1063-64 (11th Cir. 2016) (when government restricts speech, it bears burden of showing the constitutionality of its actions);

521 U.S. at 867; *Sable,* 492 U.S. at 128; *Cruz v. Ferre*, 755 F.2d 1415, 1421 (11th Cir. 1985).

*Broward Coal. of Condos. v. Browning*, No. 4:08cv445-SPM/WCS, 2009 U.S. Dist. LEXIS 43925, at *15-16 (N.D. Fla. May 22, 2009).

    C. This Court should err on the side of protecting offensive speech that is designed to make a political or philosophical point

Given that the Mama Bears are engaging in what is undoubtedly protected speech, any close calls should be adjudicated in favor of protecting their speech, rather than suppressing it. Defendants have not articulated a cogent basis for suppressing this speech, other than they don't like the content being aired at school board meetings, but they are happy to have the books available to minors in the FCS libraries. Defendants' position is contradictory and confusing, and that cuts against restricting the Mama Bears' speech.

Moreover, it is apparent that a majority of the Supreme Court has embraced the propositions (i) that ideas that offend have a viewpoint, and (ii) that people may promote such ideas, even if they offend the majority of listeners. *Iancu v. Brunetti*, 139 S. Ct. 2294, 2299-2300 (2019) (bar on "immoral or scandalous" marks "discriminates based on viewpoint"). Learning to cope with that discomfort is the price of living in an open and politically diverse society. *See also, Mahanoy Area Sch. Dist. v. B.L.,* 141 S. Ct. 2038, 2056 (2021) (protecting off-campus student Snapchat post that said: "Fuck school fuck softball fuck

cheer fuck everything" with raised middle finger); *Snyder v. Phelps*, 562 U.S. 443, 454, 460-61 (2011) (protecting offensive expression of views, including "God Hates Fags," "Thank God for Dead Soldiers," and "Pope in Hell"); *Am. Freedom Def. Initiative v. King County*, 904 F.3d 1126, 1131-32 (9th Cir. 2018) (invalidating transit advertising prohibition on "disparaging" content as viewpoint discriminatory); *People for the Ethical Treatment of Animals, Inc. v. Shore Transit*, 580 F. Supp. 3d 183 (D. Md. 2022) (invalidating transit advertising prohibitions on "political," "controversial, offensive, objectionable or in poor taste" as viewpoint discriminatory).

During the hearing, this Court noted that in *Iancu,* Justice Sotomayor took the position that "[a] restriction on trademarks featuring obscenity, vulgarity, or profanity is similarly viewpoint neutral, though it is naturally content-based." 139 S. Ct. at 2314 (Sotomayor, J., concurring in part and dissenting in part). Justice Sotomayor essentially adopted the government's position, that part of the trademark prohibition could be salvaged: "it is equally possible to read that provision's bar on the registration of 'scandalous' marks to address only obscenity, vulgarity, and profanity." *Id.* at 2308. In so doing, she was in the dissent, and her views do not represent those of the majority.

In contrast, a majority of the Supreme Court held that a bar on scandalous marks expressed a facially impermissible viewpoint-based prohibition, even

when that term can be read to include profane or sexually explicit marks. *Id.* at 2301.

But even if this Court is inclined to read *Iancu* as leaving a hypothetical narrow path for prohibiting vulgarity or profanity on a viewpoint-neutral basis, that path is all but foreclosed by *Cohen v. California*, 91 S. Ct. 1780, 1783-84 (1971), especially under the circumstances of this case.

*Cohen* involved the use of what is perhaps the mother-of-all profanity: Fuck. *Id.* at 16. But it did not involve a mere gratuitous use of that word or a personally directed use of that word. *Id.* at 1785-86 ("[I]t was clearly not 'directed to the person of the hearer.'"). It was political speech designed to criticize conscription during the Vietnam War. *Id.* at 1783-84 ("[T]he words were on the jacket as a means of informing the public of the depth of his feelings against the Vietnam War and the draft."). Moreover, the court noted that the use of "Fuck" in "Fuck the Draft" served to convey "otherwise inexpressible emotions as well." *Id.* at 1788.

Like *Cohen,* the Mama Bears seek to read from offensive texts to serve a political purpose: to draw attention to their views based on both reason and emotion, to make the Board uncomfortable, and to directly illustrate why they do not want the quoted books so readily available to minor students in schools.

Perhaps they could find other ways to express those views, but the First Amendment allows them to craft their message in the way they see fit.

Like *Cohen,* the Mama Bears are not directing swear words at the board in a gratuitous, personal manner.[2] Merely spewing curses may not advance this limited public forum's purpose. But Plaintiffs are making a political point by reading from the books as evidence.

Under these circumstances, any ambiguity about whether the book excerpts are "profane" should be decided in favor of the speakers, not the censors. There is a clear bias in First Amendment jurisprudence: toward allowing more speech, not less.

III. THE REVISED POLICY IS VAGUE AND ALLOWS FOR EXCESSIVE DISCRETION BECAUSE EVEN DEFENDANTS DON'T KNOW WHAT IT RESTRICTS

Defendants admit that beyond the provision prohibiting "profane" comments, "other provisions of the newly adopted Policy and Rules might also

---

[2] *Compare, Dyer v. Atlanta Indep. Sch. Sys.,* 852 F. App'x 397, 398 (11th Cir. 2021) (pro-se plaintiff had engaged in a decade of heated, over-the-top rhetoric toward board, culminating in calling them the "N-word" and "coons"). This is not to say that *Dyer* was necessarily correctly decided, but it presents very different facts, involving a mix of behavior and speech where the speech's relevance to the forum was unclear. It is also a non-binding. 11th Cir. R. 36-2.

have been applied to [the Mama Bears' past] speech[.]" ECF No. 30. Which ones? They aren't sure.

During the hearing, defense counsel first claimed the book excerpts were obscene, but then he backed off under questioning from the Court. So, are they obscene or aren't they? We are also left to wonder what the terms "profane" and "abusive" mean in the new Policy, among other terms. But if defense counsel doesn't even know what the policy means, then how are the Mama Bears or other speakers supposed to know what speech is permitted during public comment?

Perhaps there is no better evidence that the new Policy is vague, and contains excessive enforcement discretion, than the reality that Defendants cannot clearly articulate what their own policy means. And this is not a merely theoretical point.

Defendants' policy does not provide any guidelines for determining what qualifies as "profane," "obscene," "uncivil," "disrespectful," "abusive," or "loud and boisterous." That invites subjective and selective enforcement against disfavored speakers. *People for the Ethical Treatment of Animals,* 580 F. Supp. 3d at 195 (there are no additional guidelines to limit Defendants' discretion in determining what constitutes a transit advertisement that is "political" or "controversial, offensive, objectionable, or in poor taste"); *Marshall v. Amuso*,

571 F. Supp. 3d 412, 424 (E.D. Pa. 2021) ("In parsing out these subjective terms, the School Board has presented no examples of guidance or other interpretive tools to assist in properly applying Policies 903 and 922 to public comments."); *see also Minn. Voters All. v. Mansky,* 138 S. Ct. 1876, 1891 (2018) (cited by both *Marshall* and *People for the Ethical Treatment of Animals* for the proposition that officials' "discretion must be guided by objective, workable standards"). Accordingly, in *Marshall,* also a school-board speech case, the court facially invalidated two speech policies on vagueness grounds. "Allowing little more than the presiding officer's own views to shape 'what counts' as irrelevant, intolerant, abusive, offensive, inappropriate, or otherwise inappropriate under the policies openly invites viewpoint discrimination." *Marshall,* 571 F. Supp. 3d at 424.

The Court should do likewise here. In the alternative, this Court should at least hold that the provisions of the new Policy are unconstitutional as-applied to the core speech that the Mama Bears wish to engage in: to read verbatim from excerpts of books in the FCS libraries, as evidence to support their political viewpoints.

Dated: September 30, 2022

_s/Endel Kolde_____
Endel Kolde *(pro hac vice)*

INSTITUTE FOR FREE SPEECH
1150 Connecticut Ave., NW,
Suite 801
Washington, DC  20036
202-301-3300
dkolde@ifs.org

Respectfully submitted,

__s/Erika Birg_____
Erika C. Birg
Georgia Bar No. 058140
NELSON MULLINS RILEY
& SCARBOROUGH, LLC
Atlantic Station Suite 1700
201 17th Street NW
Atlanta, GA 30363
404-322-6110
erika.birg@nelsonmullins.com


*Counsel for Plaintiffs*

CERTIFICATE OF COMPLIANCE

This brief complies with the typeface requirements and spacing requirements of LR 5.1(C) because this brief has been prepared in double spaced typeface using Microsoft Word in 13-point in Century Schoolbook.

*s/Endel Kolde*
Endel Kolde
Attorney for Plaintiffs
