# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# GAINESVILLE DIVISION

| | |
|---|---|
| MAMA BEARS OF FORSYTH COUNTY, ALISON HAIR, and CINDY MARTIN,<br><br>   Plaintiffs,<br><br>   v.<br><br>WESLEY MCCALL, Chair, Forsyth County Board of Education, in his official and individual capacities; FORSYTH COUNTY SCHOOL DISTRICT (also known as FORSYTH COUNTY SCHOOLS); KRISTIN MORRISSEY, Vice Chair, Forsyth County Board of Education, in her official and individual capacities; TOM CLEVELAND, Member, Forsyth County Board of Education, in his official and individual capacities; LINDSEY ADAMS, Member, Forsyth County Board of Education, in her official and individual capacities; and DARLA LIGHT, Member, Forsyth County Board of Education, in her official and individual capacities,<br><br>   Defendants. | Civil Action No.<br><br>2:22-CV-142-RWS |

# ORDER

This case comes before the Court on Plaintiffs Mama Bears of Forsyth County, Alison Hair, and Cindy Martin's Motion for Preliminary Injunction [Dkt. 2]. After reviewing the parties' briefs, the Court enters the following Order.

## BACKGROUND

### I. Factual Background

Before diving into the (largely undisputed) facts of this case, the Court finds it prudent to briefly explain what the case *is* about and what it is *not* about. At its core, this case addresses fundamental First Amendment questions about what type of speech can and cannot be restricted at school board meetings. Though the speech at issue which gave rise to this litigation involved what types of books are and should be found and made available in school libraries, a topical and common debate in our society as a whole, there is no need or basis for the Court to wade into that issue. The Court will focus its attention on the important First Amendment issues that have been identified by the parties, not which books should or should not be in school libraries, and it encourages and instructs the parties to continue doing the same as this case progresses.

## A. The Parties

Mama Bears of Forsyth County ("Mama Bears") is an association whose mission is to organize, educate, and empower parents to defend their parental rights. Alison Hair and Cindy Martin are both citizens of Georgia, residents of the Forsyth County School District, and members of Mama Bears. Ms. Hair and Ms. Martin both have school-aged children in Forsyth County, and Ms. Martin is the Chair of Mama Bears.

Forsyth County School District (or Forsyth County Schools) is a school district that operates the public schools of Forsyth County, Georgia. The school system is run by the Board of Education (the "Board"), which is composed of five elected members. The Board has the role of legislating the school system's policies and transacting business pertaining to the public schools. Wesley McCall is the Chair of the Board, Kristin Morrissey is the vice Chair, and Tom Cleveland, Darla Light, and Lindsey Adams are the remaining members.

## B. Relevant Legislation and the Board's Public Participation Policy

Under Georgia law, local boards of education are required to hold monthly meetings. O.C.G.A. § 20-2-58(a). Each monthly meeting must be open to the public and include a public comment period. O.C.G.A. § 20-2-58(a), (c). The chair of the board may "limit the length of time for individual comments and the

number of individuals speaking for or against a specific issue," O.C.G.A. § 20-2-58(a), and the board may "remove" a member of the public from the meeting "for an actual disruption of the proceedings." O.C.G.A. § 20-2-58(c)(4). Each board is required to "adopt rules of conduct for public meetings," which must include provisions for removal based on the "actual disruption of a public meeting" of the board. O.C.G.A. § 20-2-58(c)(3).

Due to this mandate, the Board has a policy entitled "Public Participation in Board Meetings" (the "public participation policy"). The public participation policy was revised on April 20, 2021 and included several provisions that are relevant here. First, the public participation policy stated that speakers' remarks "shall be made to the Board as a body and addressed through the chair" and "shall not be addressed to individual Board members." [Dkt. 1-3 – Public Participation Policy]. Second, it asked speakers "to keep their remarks civil" and stated that "[p]rofane, rude, defamatory remarks and personal attacks will not be allowed." [Id.]. Third, it clarified that the chairman was responsible for its enforcement "and speakers who are found in violation will have their allotted speaking time immediately concluded." [Id.]. And finally, the public participation policy provided that "[b]y reading and acknowledging acceptance prior to speaking during public participation, speakers attest that they understand and will abide by"

its terms, and the "[f]ailure to abide by the policy may result in forfeiture of the right to participate in future Board meetings." [Id.].

In April 2022, Georgia passed O.C.G.A. § 20-2-324.6(b), which required each board of education to establish a new, streamlined complaint resolution policy for reviewing school material that may be harmful to minors by January 1, 2023.

### C. The Mama Bears' Participation at Board Meetings

For this Court's purposes, the dispute at issue began at the Board's February 15, 2022 meeting. At the start of the public comment portion of the meeting, Chair McCall read aloud from the public participation policy. In so doing, he added some language not found in the text of the public participation policy, stating that speech on "inappropriate public subjects" was not allowed.

Ms. Hair and Ms. Martin both spoke during the public comment period at this meeting, and both intended to criticize the Board for not removing what they deemed to be sexually explicit books from school libraries and to ask the Board to address the issue differently. Ms. Hair spoke first, and she explained that she would read aloud an excerpt from the book "Extremely Loud and Incredibly Close" during her speaking time. She started reading: "I know that you give someone a blow job by putting your penis…." At that point, Chair McCall sounded his gavel, and said the following:

> So, you have, we have a couple options. One is you can
> continue and go back to the rules that we talked about at
> the beginning.... Or two. We can finish now. We have
> other people that are younger in this and I, we understand
> your point... But we don't know... We have not had an
> opportunity to vet this. We...also have a vetting system
> in place...so the books are not read out loud.

Ms. Hair then tried to continue speaking:

> I will move on to the rest of my comments and I would
> like my time... To please be returned.... And how, how
> dare you say 'Oh well there's minors in here, wait, what
> is it? My son's a minor and this book that you all have
> copies of is in my son's middle school. So, here's what
> I'm here to tell you. I am here to confront evil....

At that point, Chair McCall interrupted Ms. Hair to tell her that her speaking time
was up.

Later in the public comment period, Ms. Martin took the opportunity to
speak and express her disappointment with the Superintendent. At that time, Chair
McCall interrupted her and instructed her to "be respectful." She then read from
what she considered to be a sexually explicit school library book but substituted
acronyms and pauses for certain sexually explicit words.

The Board held its next meeting on March 15, 2022. Chair McCall again
began the public comment period by reading aloud from the public participation
policy, again adding some language not found in the policy. This time, he stated
that "comments which involve inappropriate public subjects" and "read[ings]

[which are] inappropriate to being stated in public" were prohibited. Later in the meeting, Chair McCall stated that speakers could not "call out any board member by name" or "make any direct comment to them" so that they could "all feel respectful."

Ms. Hair spoke at this meeting, first imploring the Board to respect her First Amendment rights. Then, she tried to read aloud from "Georgia Peaches and Other Forbidden Fruit." She stated:

> We pushed back together feeling the warmth and silk of each other's skin. Our breaths were coming faster and harder. My mouth circles the soft skin of my breasts and I cried, arching up into her….I flip over again straddling her. I kiss my way down her breastbone. I'm taking each nipple right in between my teeth…

Chair McCall then banged his gavel and interrupted Ms. Hair. She asked for her public comment time to be restored to her, and he demanded that she "follow [the] rules." They went back and forth for a bit, during which Chair McCall stated that Ms. Hair had violated the rules while reading the book and concluded that he was simply enforcing the guidelines. The audience became animated as well. Chair McCall ultimately called for a recess and did not permit Ms. Hair to finish her speaking time. Ms. Hair then left the Board meeting.

A few days later, on March 17, 2022, Chair McCall wrote Ms. Hair a letter stating that she could not return to future Board meetings until she "states in

writing, to [him], that [she will] follow the rules of the Board regarding public participation and that [she will] follow [his] directives." On May 11, 2022, the full Board sent her a letter reaffirming her prohibition from its meetings because her "remarks were not civil." Ms. Hair has not since gone to any Board meetings, and Ms. Martin has refrained from speaking at Board meetings herself for fear of being silenced or removed.

### D. Revised Public Participation Policy

On August 16, 2022, the Board announced that it was proposing a revised public participation policy. The revised public participation policy removes several provisions from the original policy and adds several new provisions. First, it states that "[m]embers of the public shall conduct themselves in a respectful manner that is not disruptive to the conduct of the Board's business." Second, it modifies the civility clause, providing that:

> Speakers are asked to keep their remarks civil. The use of obscene, profane, physically threatening or abusive remarks will not be allowed. Loud and boisterous conduct or comments by speakers or members of the audience are not allowed.

And third, it expands on the punishments that can be imposed for violations of the rules. In other words, as compared to the original public participation policy, the revised public participation policy includes the following changes: it maintains the

prohibition on personally directed and "profane" remarks and the request to keep remarks "civil"; it drops the prohibition on "rude, defamatory, and personal attacks"; it adds the prohibition on "obscene, … physically threatening or abusive remarks," and "[l]oud and boisterous conduct or comments"; and adds the requirement that members of the public behave respectfully and non-disruptively.

The Board voted on and adopted the revised public participation policy on September 20, 2022. This revised public participation policy is the one now at issue.

## II.    Procedural History

On July 25, 2022, Plaintiffs filed their initial Complaint, asserting the following claims: First Amendment facial challenge to the public participation policy as a violation of the right of free speech (Count I); First Amendment as-applied challenge to the public participation policy as a violation of the right of free speech (Count II); First Amendment facial challenge to the public participation policy as a violation of the right to petition (Count III); First Amendment as-applied challenge to the public participation policy as a violation of the right to petition (Count IV); Fourteenth Amendment vagueness challenge to the public participation policy (Count V); First and Fourteenth Amendment

overbreadth challenge to the public participation policy (Count VI); and a prior restraint challenge to the public participation policy (Count VII) [Dkt. 1].

Plaintiffs also filed a Motion for Preliminary Injunction, asking the Court to find that the Board's speech policies, on their face and as applied to them, violate the First Amendment's prohibition of viewpoint discrimination; conclude that the policies violate their free speech and petition rights; and enjoin Defendants' enforcement of the speech policies and the Board's prohibition of Ms. Hair's attendance and participation at Board meetings [Dkt. 2]. Defendants opposed Plaintiffs' Motion for Preliminary Injunction [Dkt. 17], and Plaintiffs filed a reply in support [Dkt. 20].

Around the same time that the preliminary injunction briefing was complete, the parties notified the Court that the Board had drafted a modified public participation policy that would be voted on at the September Board meeting. On September 6, 2022, the Court held a telephone conference to discuss pending issues and schedule a hearing on Plaintiffs' request for a preliminary injunction, particularly as applied to the revised public participation policy. The Court scheduled the hearing for two weeks later and requested short, targeted briefs in advance. On September 15, 2022, both parties filed their pre-hearing memoranda [Dkt. 25, 26]. The next day, Plaintiffs filed their First Amended Complaint,

asserting the same legal claims as their original Complaint but tailoring their arguments to the revised public participation policy language [Dkt. 27].

On September 20, 2022, the Court held a hearing on Plaintiffs' Motion for Preliminary Injunction, during which the parties presented arguments on their respective positions. The Court requested supplemental briefing on several of the most salient outstanding issues, including whether Plaintiffs would still have viable as-applied challenges to the public participation policy if the revised public participation policy was in fact adopted at the Board's next meeting. Following the hearing, the parties addressed one of the Court's concerns by stipulating that, had the public participation policy been in effect at the time of the February and March 2022 school board meetings, certain of its provisions would have been applied to Plaintiffs to restrict their speech [Dkt. 30]. In particular, the parties stipulated that "[a]t least the provision of the newly adopted Policy and Rules prohibiting 'profane' comments would have been applied to prevent Plaintiffs from quoting verbatim sexually explicit, graphic passages from books available in the FCS libraries and also to prohibit Alison Hair from attending future Board of Education meetings until she indicates in writing that she would follow the Rules regarding public participation." The parties also stated that "[o]ther provisions . . . might also have been applied to such speech" but that they could not reach

agreement as to which ones. The parties then filed their post-hearing briefs

addressing the other concerns raised at the hearing [Dkt. 33, 34].

## DISCUSSION

### I.     Standard for Injunctive Relief

"[A] district court may grant a preliminary injunction only if the movant

establishes the following: (1) a substantial likelihood of success on the merits of

the underlying case, (2) the movant will suffer irreparable harm in the absence of

an injunction, (3) the harm suffered by the movant in the absence of an injunction

would exceed the harm suffered by the opposing party if the injunction issued, and

(4) an injunction would not disserve the public interest." N. Am. Med. Corp. v.

Axiom Worldwide, Inc., 522 F.3d 1211, 1217 (11th Cir. 2008) (citation and

quotations omitted). "The preliminary injunction is an extraordinary and drastic

remedy not to be granted unless the movant 'clearly carries the burden of

persuasion' as to the four prerequisites." Cunningham v. Adams, 808 F.2d 815,

819 (11th Cir. 1987) (citation and quotations omitted).

A movant's ability to demonstrate the first prerequisite, a substantial

likelihood of success on the merits, is usually the most important consideration.

See Schiavo ex rel. Schindler v. Schiavo, 357 F. Supp. 2d 1378, 1383 (M.D. Fla.

2005) (citation omitted). And because the inquiry calls for a balancing of the

equities, the movant's burden to demonstrate a possibility of success on the merits will vary depending upon the Court's assessment regarding the strength and weakness of the other factors. Id. (citation omitted).

## II.    Analysis

Plaintiffs' First Amended Complaint raises a series of facial and as-applied First Amendment challenges to the public participation policy, and they ask the Court to enjoin Defendants' enforcement of several of its provisions.  In particular, they ask the Court to find that the following public participation policy provisions are unconstitutional and enjoin Defendants' enforcement of them: (1) the requirement that members of the public conduct themselves in a "respectful" and non-disruptive manner; (2) the prohibition on personally addressing Board members; (3) the request that speakers keep their remarks "civil"; (4) the prohibition on obscene remarks; (5) the prohibition on profane remarks; (6) the prohibition on abusive remarks; and (7) the prohibition on loud and boisterous conduct or comments.  They also ask the Court to find unconstitutional and enjoin Defendants' permanent ban of Ms. Hair from future Board meetings.

In the course of their respective arguments, the parties frame the dispute differently.  Plaintiffs argue that the First Amendment guarantees them the right to criticize school officials' choice of library books and the right to express that

criticism in the manner that they choose, which in this case is by reading the books aloud in public at school board meetings.  Defendants take a much narrower position, asserting that Plaintiffs' rights have not been infringed because there is no First Amendment right to read aloud sexually explicit, graphic passages from a book in a limited public forum.  The Court will first consider Plaintiffs' likelihood of success on the merits as to each disputed provision in the public participation policy, and then will evaluate the remaining preliminary injunction factors in turn. It will then assess the constitutionality of Ms. Hair's permanent ban from Board meetings.

### A. Likelihood of Success on the Merits

The First Amendment, applicable to the states through the Fourteenth Amendment, prohibits the government from "abridging the freedom of speech." U.S. Const. amend. I.  "The strength of the First Amendment protection, and the level of justification required for a speech restriction, varies depending on the forum where the speech occurs."  Ison v. Madison Local Sch. Dist. Bd. of Educ., 3 F.4th 887, 893 (6th Cir. 2021) (citation omitted).  The parties here agree that the Board meetings constitute a "limited public forum," meaning that it "is limited to use by certain groups or dedicated solely to the discussion of certain subjects."

Pleasant Grove City, Utah v. Summum, 555 U.S. 460, 470 (2009) (citation omitted).

In a limited public forum, the government can "regulate features of speech unrelated to its content" through "time, place, or manner" restrictions. McCullen v. Coakley, 573 U.S. 464, 477 (2014). Such restrictions are permissible if "they are narrowly tailored to serve a significant governmental interest, and [they] leave open ample alternative channels for communication of the information." Id. (citation and quotations omitted). Beyond these restrictions, the Supreme Court has observed a distinction between content discrimination and viewpoint discrimination. "[C]ontent-based restrictions are valid as long as they are reasonable and viewpoint neutral," but "viewpoint discrimination is impermissible in any forum." Marshall v. Amuso, 571 F. Supp. 3d 412, 421 (E.D. Pa. 2021) (citations, punctuation, and quotations omitted). "Impermissible viewpoint discrimination does not neutrally treat an entire subject as off limits, but rather permits some private speech on the subject and only disfavors certain points of view." Ison, 3 F.4th at 893 (citation and quotations omitted). "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is blatant." Marshall, 571 F. Supp. 3d at 421 (citation, punctuation, and quotations omitted). "The government must

abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." Id. (citation and quotations omitted).

"Giving offense is a viewpoint." Id. (citing Matal v. Tam, 137 S. Ct. 1744, 1763 (2017)). "Disfavoring ideas that offend discriminates based on viewpoint, in violation of the First Amendment." Id. (citing Iancu v. Brunetti, 139 S. Ct. 2294, 2301 (2019)). "A viewpoint need not be political; any form of support or opposition to an idea could be considered a viewpoint." Id. (citation omitted).

In a typical case, the party moving for a preliminary injunction bears the burden of establishing its likelihood of success on the merits. Id. However, "in First Amendment cases the initial burden is flipped." Id. (citation, punctuation, and quotations omitted). Instead, "[t]he government bears the burden of proving that the law is constitutional and, as a result, the plaintiff must be deemed likely to prevail if the government fails to show the constitutionality of the law." Id. (citation and quotations omitted).

## 1. Requirement that Members of Public Conduct Themselves in a Respectful and Non-Disruptive Manner

First, Plaintiffs bring a facial and as-applied challenge to the public participation policy's requirement that "[m]embers of the public [] conduct themselves in a respectful manner that is not disruptive to the conduct of the

Board's business." At the outset, nobody disputes that the Board can generally restrict speech that disrupts its business. Nor would that be a viable argument, as the relevant statute permits the Board to remove members of the public "for an actual disruption" and this Court has affirmed that speech that "causes a material disruption . . . is not immunized by the constitutional guarantee of freedom of speech." Dyer v. Atlanta Indep. Sch. Sys., 426 F. Supp. 3d 1350, 1359 (N.D. Ga. 2019) (citation and quotations omitted).

Instead, Plaintiffs focus on the respectfulness requirement. In so doing, they argue that the phrase "respectful manner" is highly subjective and lends itself to broad interpretation by Chair McCall, and, in any event, "[t]he First Amendment does not require Americans to speak to government officials in a respectful manner" since "unpleasant criticism comes with the territory" in a democracy. [Dkt. 25 – Pls.' Pre-Hr'g Memo., at 6]. Defendants are largely silent on this issue.

For the facial challenge, the Court first looks to the public participation policy's text to determine whether it unconstitutionally burdens speech. Ison, 3 F.4th at 893 (citation omitted). Unfortunately, the public participation policy contains no definition of "respectful" and provides no explanation of what type of conduct does or does not constitute a "respectful manner." But Merriam-Webster defines "respectful" to mean "marked by or showing respect or deference," and it

defines "respect" as "high or special regard" and "the quality or state of being esteemed." See Respectful, Merriam-Webster, https://www.merriam-webster.com/dictionary/respectful; Respect, Merriam-Webster, https://www.merriam-webster.com/dictionary/respect.  In addition, Merriam-Webster lists as antonyms to "respectful" words such as "abusive," "insulting," "offensive," "demeaning," "derogatory," "disparaging," "rude," and, of course, "disrespectful."  See Respectful, Merriam-Webster, https://www.merriam-webster.com/thesaurus/respectful.  And in the February 15 Board meeting, Chair McCall interrupted Ms. Martin's critique of his own job performance by telling her to "be respectful."  [Dkt. 27 – First Am. Compl., at ¶ 48].  Taken together, then, the public participation policy's requirement that members of the public "conduct themselves in a respectful manner" most logically seems to mandate that they show high or special regard or esteem towards Board members and other meeting attendees and refrain from insulting them or being offensive, rude, insulting, or abusive towards them.  Such a requirement is viewpoint-based and thus facially unconstitutional.

The Court has not found many cases addressing similar "respectful manner" or "respectfulness" provisions.  However, several courts have addressed policies prohibiting "abusive," "antagonistic," or "negative" statements or comments, and

the Court finds those cases and the analysis therein to be instructive here.  For

example, in Griffin v. Bryant, the District of New Mexico concluded that a policy

prohibiting "negative mention … of any Village personnel, staff or the Governing

Body" was facially unconstitutional because it "permit[ted] praise and neutral

feedback, but not criticism, of both government employees and, worse, the

Governing Body itself."  30 F. Supp. 3d 1139, 1173 (D.N.M. 2014).  Then, in Ison,

the Sixth Circuit found that a policy prohibiting "antagonistic" and "abusive"

speech "plainly fit in the broad scope of impermissible viewpoint discrimination

because [] they prohibit speech purely because it disparages or offends."  Ison, 3

F.4th at 894 (citation and quotations omitted).  Finally, in Marshall, the Eastern

District of Pennsylvania found that the policy restrictions on the use of "abusive"

and "offensive" comments were impermissible viewpoint discrimination.  571 F.

Supp. 3d at 422.

 The Court recognizes that not every court to address similar policy

provisions has reached this conclusion, and indeed some have upheld policies

prohibiting rude, abusive, and defamatory speech.[1]  But it is this Court's view, the

---

[1] See, e.g., Moms for Liberty – Brevard Cnty., FL v. Brevard Pub. Sch., 582 F.
Supp. 3d 1214, 1219-20 (M.D. Fla. 2022) (rejecting request to enjoin prohibition
on "abusive" comments because such a restriction was "critical to prevent
disruption, preserve reasonable decorum, and facilitate an orderly meeting")
(citations and quotations omitted); Davis v. Colerain Twp., 551 F. Supp. 3d 812,

public participation policy's "respectful manner" requirement impermissibly targets speech unfavorable to or critical of the Board while permitting other positive, praiseworthy, and complimentary speech. And that is exactly what the First Amendment is intended to prevent in a setting like a school board meeting. Members of the public must be able to provide their feedback and critiques, even if some people, Board members included, find that distasteful, irritating, or unfair. Indeed, as the Supreme Court recently observed, "[g]iving offense is a viewpoint." Matal, 137 S. Ct. at 1763. Now, that is not to say that the public's speech at Board meetings is unbounded—quite the contrary. As the Court has mentioned already and will discuss again, the Board can limit and curtail speech on other bases, such as when that speech actually disrupts its meetings. But it cannot do so under the guise of the subject speech in question being disrespectful.

Accordingly, the Court finds that Plaintiffs are substantially likely to succeed on their facial challenge to the public participation policy's respectfulness

---

820-21 (S.D. Ohio 2021) (upholding policy prohibiting disrespectful speech largely because it was "reasonable to further the government's purpose of conducting an orderly, efficient, and productive meeting."). That said, there are two relevant caveats: first, the court's order in Moms for Liberty is currently on appeal to the Eleventh Circuit, and second, following the Sixth Circuit's opinion in Ison, the Colerain Township board repealed its rule barring disrespectful speech, impliedly acknowledging that such a restriction was not constitutional under applicable precedent. Davis v. Colerain Twp., 51 F.4th 164, 175 (6th Cir. 2022).

requirement. And because the Plaintiffs' facial challenge is successful, the Court

need not address their as-applied challenge to the same provision. The Court

grants Plaintiffs' motion to enjoin Defendants' enforcement of this provision.

### 2. Prohibition on Personally Addressing Board Members

Plaintiffs make a facial and as-applied challenge to the public participation

policy provision prohibiting remarks from being personally addressed to individual

Board members, though neither party spends much time discussing its

constitutionality.

This prohibition does not fall neatly into the time, place, or manner

restriction framework, and therefore can only survive as a content-based restriction

if it is reasonable and viewpoint neutral. See Moore v. Asbury Park Bd. of Educ.,

2005 WL 2033687, at *12 (D.N.J. Aug. 23, 2005) ("We find that the 'personally

directed' provision of the Bylaw, on its face and as applied by the Board, contains

content-based restrictions on speech.") (citation omitted). Neither the public

participation policy itself nor the Defendants' briefing make clear the intended

purpose behind this provision. However, the Court can discern two possibilities:

first, the Board may wish to limit any potential negativity or excessive critiques

directed toward individual Board members, and second, the Board may seek to

streamline meetings and keep them efficient and on topic. Laudable as these

explanations and rationale are, the Court can envision scenarios in which members of the public may have legitimate reasons to address members of the Board personally or directly. And the public participation policy already includes several provisions that can reasonably accomplish the Board's goals without potentially infringing on otherwise protected speech. For example, the prohibitions on "physically threatening remarks" and disruptive conduct could be invoked to limit certain speech directed towards Board members that may have, for lack of a better phrase, crossed the line, and terminate speech or conduct that inhibits the meeting's progress.

Other courts have found similar policies restricting "personally directed" comments or language to be unconstitutionally vague and overbroad. See, e.g., Ison, 3 F.4th at 893-95 (finding that policy's restriction on personally directed speech violated the First Amendment); Marshall, 571 F. Supp. 3d at 422-26 (concluding that provision allowing for the interruption or termination of public comments deemed "personally directed" was facially unconstitutional); Moore, 2005 WL 2033687, at *11-13 (concluding that plaintiffs were substantially likely to succeed on their challenge to the "personally directed" provision as "an unconstitutional restraint on speech," while also noting that the provision was "not essential to the Bylaw's goal of permitting the fair and orderly expression of public

comments, and numerous other provisions in the Bylaw contribute toward that end.") (citation omitted).

The Court agrees and finds that the restriction on personally addressing Board members is not reasonable, and therefore that Plaintiffs are substantially likely to succeed on their facial challenge to that provision. And because the Plaintiffs' facial challenge is successful at this stage, the Court need not address their as-applied challenge.[2] The Court grants Plaintiffs' motion to enjoin Defendants' enforcement of this provision.

### 3. Request for Speakers to Keep Remarks Civil

Plaintiffs assert a facial and as-applied challenge to the public participation policy's so-called "civility clause," through which "[s]peakers are asked to keep their remarks civil." They argue that the First Amendment protects even "uncivil" speech, and that Defendants unconstitutionally applied this provision in part by invoking it to ban Ms. Hair from future Board meetings. [Dkt. 33 – Pls.' Am.

---

[2] Even so, it is not clear to the Court that this provision was even enforced against Plaintiffs. Plaintiffs' First Amendment Complaint references another speaker who named two of the Board members during her speaking time and was told she could not "call out the board." [Dkt. 27 – First Am. Compl., at 15]. But the Court has not seen any evidence that during the two Board meetings in question, Plaintiffs "personally addressed" any of the Board members (aside from perhaps Chair McCall in their various back-and-forths).

Post-Hr'g Memo., at 7-8]. Defendants largely ignore Plaintiffs' arguments as to this provision.

This provision presents a unique challenge. Though Plaintiffs argue that speakers are *required* to keep their remarks civil, that is not what the text of the public participation policy actually says. To the contrary, the public participation policy simply *requests* that speakers behave a certain way, rather than mandates or requires it. In other words, it does not actually prohibit or restrict any types of speech. And such an aspirational provision is not automatically unconstitutional—to the contrary, it can be acceptable for the Board to seek and request a certain level of decorum during its meetings, so long as that aspiration is not impermissibly treated as a mandate. As such, the Court will not find the non-compulsory civility provision to be facially unconstitutional at this stage.

But Plaintiffs' as-applied challenge is where Defendants run into trouble. Although the civility clause itself is on its face a request, Defendants did not apply or treat it that way. Indeed, in its May 11, 2022 letter to Ms. Hair, the Board stated that, at the March Board meeting, she violated the public participation policy provision asking speakers to keep their remarks civil. [Dkt. 2-5 – May 11, 2022 Letter]. More specifically, the Board stated that it "felt that [her] remarks were not civil" and immediately thereafter advised her that she was banned from attending

future Board meetings until she stated in writing that she would follow the public

participation policy and Chair McCall's directives. [Id.]. There are several

problems with the Board's interpretation and application of the provision. First,

neither the public participation policy nor the Board's letter explain what "civil" is

intended to mean or what language it is supposed to exclude, making it nearly

impossible for Plaintiffs to tailor their speech accordingly. Second, though the

undefined nature of the term and the basis for its application here require the Court

to speculate, it seems likely that the Board has applied the civility provision in a

manner that restricts protected speech such as criticism of the Board.[3] And third, it

appears that the Board may have selectively (and arguably inconsistently) applied

it to certain speakers but not to others. Indeed, both Ms. Hair and Ms. Martin—

---

[3] See Coll. Republicans at San Francisco State Univ. v. Reed, 523 F. Supp. 2d 1005, 1019-24 (N.D. Cal. 2007) (enjoining enforcement of civility clause because it "easily could be understood as permitting only those forms of interaction that produce as little friction as possible, forms that are thoroughly lubricated by restraint, moderation, respect, social convention, and reason" and "mandating civility could deprive speakers of the tools they most need to connect emotionally with their audience, to move their audience to share their passion"). Again, though, the Board is free to restrict speech that actually disrupts the Board's business, it may not do so simply on the grounds of that speech being "uncivil." Id. at 1024 n.10 ("This preliminary injunction does *not prohibit* the University from disciplining students for engaging in conduct that clearly would be considered 'uncivil' if that conduct also violated a more specific proscription that was tailored in conformity with the First Amendment. The authority to impose discipline in any such circumstance would be rooted only in the more specific proscription.") (emphasis in original).

and other speakers—used their speaking time to criticize the Board and superintendent and read aloud from what they found to be sexually explicit books, and Chair McCall interrupted several of them to tell them to be respectful and follow the rules. However, the Board only punished Ms. Hair for her allegedly "uncivil" remarks, restricting her from future meetings unless she agreed to follow the rules. They did not take the same actions with regard to Ms. Martin or any other speaker.

Given these facts, the Court finds that Plaintiffs are not substantially likely to succeed on their facial challenge to this provision but are substantially likely to succeed on their as-applied challenge.

### 4. Prohibition on Obscene Remarks

Plaintiffs also make a facial and as-applied challenge to the public participation policy's prohibition on obscene language. They argue that the revised public participation policy does not define obscenity, and "it cannot, in any event, be reasonably construed to apply to reading from a school book to make a political or philosophical point about whether the book is appropriate to have available in schools." [Dkt. 25 – Pls.' Pre-Hr'g Memo., at 7]. But they also seem to acknowledge in their post-hearing memorandum that a prohibition on obscenity is permissible in this setting so long as all three prongs of the <u>Miller</u> test are met

(which they do not believe is the case here). [Dkt. 33 – Pls.' Am. Post-Hr'g Memo., at 8-10].

Plaintiffs' facial challenge to the public participation policy's obscenity provision clearly fails. The Supreme Court held nearly fifty years ago that "obscene material is not protected by the First Amendment." Miller v. California, 413 U.S. 15, 36 (1973) (citations omitted). And in the years since, many courts across the country have reinforced that principle, in relevant part by upholding school board policies prohibiting obscene comments from the public. See, e.g., Moms for Liberty, 582 F. Supp. 3d at 1219 ("[P]rohibiting . . . obscene comments is not based on content or viewpoint, but rather is critical to prevent disruption, preserve reasonable decorum, and facilitate an orderly meeting—which the Eleventh Circuit has held on multiple occasions is permissible.") (citations and quotations omitted); Grant v. Slattery, 2022 WL 4550632, at *5 (D.N.J. Sept. 29, 2022) ("[W]hen a school board executes a policy that prohibits . . . obscene comments from the public during a school board meeting, there is no First Amendment violation.") (citation omitted); Komatsu v. City of New York, 2021 WL 256956, at *3 (S.D.N.Y. Jan. 26, 2021) (rejecting First Amendment claim where school board turned off plaintiff's camera during online school board meeting because "he made an obscene gesture" towards the council members,

which the court found to be "a reasonable restriction imposed to prevent his ability to further disrupt the meeting, and involved no impermissible viewpoint discrimination"). The same reasoning applies here: the Board's prohibition of obscene remarks is facially constitutional.

Plaintiffs' as-applied challenge to the public participation policy's obscenity provision requires a bit more nuance. As mentioned, the obscenity provision was not a part of the original public participation policy and was therefore not invoked as a basis for restricting Plaintiffs' speech in the February and March Board meetings. At the hearing on Plaintiffs' preliminary injunction motion, counsel for Defendants could or would not say for certain whether Defendants considered Plaintiffs' speech to be legally obscene or not, and therefore whether they would have invoked the obscenity provision to restrict Plaintiffs' speech had it in been in place at the time. Finally, while the parties' post-hearing joint stipulation acknowledged that the profanity provision would have been applied to Plaintiffs' speech, they were not able to agree on which other provisions of the revised public participation policy might also have been applied to restrict their speech. [Dkt. 30 – Stipulation, at ¶¶ 3-4]. Taken together, these facts give the Court serious doubt as to whether there is currently a viable as-applied challenge to the obscenity provision. And given this doubt, the Court certainly cannot find that Defendants

have applied the obscenity provision in an unconstitutional manner to this point. However, that is not to say that Defendants could not unconstitutionally misapply the obscenity provision in the future. Indeed, the Board must make sure to apply the <u>Miller</u> test in determining whether speech is obscene and thus unprotected.[4] Should the Board misapply the <u>Miller</u> test and exclude speech it deems to be obscene that should in fact be protected, Plaintiffs could then prevail on their as-applied challenge to this provision.

Accordingly, the Court finds that Plaintiffs are not substantially likely to succeed on their facial or as-applied challenges to the obscenity provision and denies Plaintiffs' motion to enjoin Defendants' enforcement of this provision.

### 5. Prohibition on Profane Remarks

Next, Plaintiffs assert a facial and as-applied challenge to the public participation policy's prohibition on profane remarks by speakers. Plaintiffs argue that the term "profane" is vague, allows for unbounded discretion, and encompasses protected speech. [Dkt. 33 – Pls.' Am. Post-Hr'g Memo., at 10-12].

---

[4] To do so, it must analyze three factors: "(a) whether the average person, applying contemporary community standards would find that the work, taken as a whole, appeals to the prurient interest; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." <u>Miller</u>, 413 U.S. at 24 (citation and quotations omitted).

Defendants, for their part, simply argue that profanity or profane speech is not protected under the First Amendment. [Dkt. 34 – Defs.' Post-Hr'g Br., at 1-4]. In the Court's view, this provision is perhaps the most challenging, largely because it is not entirely clear what the word profanity means and what type of speech it encompasses.

As with other provisions already discussed, the public participation policy unfortunately provides no definition of profane or profanity. In their post-hearing memorandum, Plaintiffs acknowledge that there is no fixed legal definition of profane, but ultimately advocate for a definition that includes words that "are considered generally offensive by contemporary community standards," such as "offensive sexual or excretory speech," or, more concisely, "non-obscene speech, that is nevertheless offensive to some." [Dkt. 33 – Pls.' Am. Post-Hr'g Memo., at 10-12]. Conversely, Defendants argue that whatever its broader definition, profane should be read to include "sexually explicit, graphic" language or speech. [Dkt. 34 – Defs.' Post-Hr'g Br. at 6-7]. And various online dictionaries approach the phrase from a religious bent, respectively defining "profane" as "grossly irreverent toward what is held to be sacred," "not holy because unconsecrated, impure, or defiled," "characterized by cursing," "irreverent," and "vulgar." See Profane,

Vocabulary.com, https://www.vocabulary.com/dictionary/profane; Profane, Merriam-Webster, https://www.merriam-webster.com/dictionary/profane.

The Court first concludes that the public participation policy's restriction on profane remarks is content-based. See, e.g., Survivors Network of Those Abused by Priests, Inc. v. Joyce, 779 F.3d 785, 790 (8th Cir. 2015) ("The Act's prohibition on profane discourse . . . is content based."); Planet Aid v. City of St. Johns, MI, 782 F.3d 318, 326 (6th Cir. 2015) ("A ban on profanity, for instance, is viewpoint-neutral, but content-based."). As such, the restriction is constitutional only if it is reasonable and viewpoint-neutral.

Courts have split on the question of whether profane remarks or profanity constitute protected speech. Indeed, in Knotts v. Oregon Trail School District 46, the District of Oregon highlighted that distinction, observing that "whether profane speech is constitutionally protected may in fact depend on its context and thus, it is not categorically protected or categorically unprotected." 2017 WL 4861521, at *3 (D. Ore. Oct. 26, 2017) (citation omitted). For example, the court noted that "profanity as political expression when communicated in a courthouse is protected speech," but "profane and vulgar speech is not protected in the school setting." Id. at *3-4 (citations omitted). A school board meeting is much more analogous to a courthouse than it is to a school full of minors, from a First Amendment

perspective.[5]  And because profane remarks or profanity are generally protected

speech in such settings, courts have generally held that outright prohibitions on

profane language or profanity are not allowed.  See, e.g., Acosta v. City of Costa

Mesa, 718 F.3d 800, 813 (9th Cir. 2013) ("§ 2–61 prohibits the making of

'personal, impertinent, profane, insolent or slanderous remarks.' That, without

limitation, is an unconstitutional prohibition on speech."); Kalman v. Cortes, 723 F.

Supp. 2d 766, 798-99 (E.D. Pa. 2010) (holding that a restriction on "'profanity,'

without more, is not a valid reason for suppressing speech.") (citation omitted).

However, that is not to say that restrictions on profanity can never be

constitutional.  In Acosta, for example, the Ninth Circuit contrasted the provision it

was evaluating, a wholesale prohibition on any profane remarks, with a provision

at issue in an earlier case, which prohibited profane remarks that "disrupt[],

disturb[], or otherwise impede[] the orderly conduct of any Council meeting."  718

---

[5] Indeed, courts have consistently held that courthouses are nonpublic forums.  See, e.g.,
Berner v. Delahanty, 129 F.3d 20, 26 (1st Cir. 1997) ("A courthouse—and, especially, a
courtroom—is a nonpublic forum.") (citations omitted); U.S. v. Gilbert, 920 F.2d 878,
884 (11th Cir. 1991) (same).  And "[t]he terms 'nonpublic forum' and 'limited public
forum' are often used interchangeably because the same reasonableness test and
prohibition against viewpoint discrimination equally applies."  Flores v. Bennett, 2022
WL 9459604, at *4 n.3 (E.D. Cal. Oct. 14, 2022) (citations omitted); see also Working
Washington v. Cent. Puget Sound Reg'l Transit Auth., 2012 WL 12916362, at *2 (W.D.
Wash. June 29, 2012) ("Speech restrictions in limited public forums are subject to the
same standard as those in nonpublic forums—they must be reasonable and viewpoint
neutral.") (citation omitted).

F.3d at 812-13 (citing White v. City of Norwalk, 900 F.2d 1421, 1424 (9th Cir. 1990)).  In so doing, the court noted that the qualifiers in the White provision "limited the potential applications of the statute to speech that caused an actual disturbance," and "[t]he requirement of actual disruption meant that the ordinance was valid." Id. at 813 (citation omitted).  In other words, then, an outright restriction on profane remarks or profanity with no limitation was unreasonable and unconstitutional, but a restriction on actually disruptive profane comments was not.  See also, e.g., Dowd v. City of Los Angeles, 2013 WL 4039043, at *17, 19-21 (C.D. Cal. Aug. 7, 2013) ("[A] speaker may not be removed from a meeting solely because of the use of profanity unless the use of profanity actually disturbs or impedes the meeting. . . . If profanity takes a speaker off topic, it could be grounds to silence the speaker because it would impede the progress of the meeting. . . . In one of the largest cities in the world, it is to be expected that some inhabitants will sometimes use language that does not conform to conventions of civility and decorum, including offensive language and swear-words. As an elected official, a City Council member will be the subject of personal attacks in such language. It is asking much of City Council members, who have given themselves to public service, to tolerate profanities and personal attacks, but that is what is required by the First Amendment.") (citation and quotations omitted); Hunt v. City of Los

Angeles, 2012 WL 12548355, at \*6 (C.D. Cal. Dec. 6, 2012) (upholding prohibition on "profane remarks to the Board, any member of the Board, staff or general public . . . that disrupts, disturbs, or otherwise impedes the orderly conduct of any Board meeting" because the "narrower construction of the Rules, which requires actual disruption, is plainly constitutional.").

Here, the public participation policy simply states that "[t]he use of . . . profane . . . remarks will not be allowed," without more. That is analogous to the unconstitutional provision in Acosta and, for the same reasons, constitutes an unreasonable restriction. Had the Board qualified the language to restrict profane remarks or profanity *that was actually disruptive* of the Board's business, that might have been a different story. But it did not, and as written, it cannot stand.

Finally, Defendants imply and argue that the profane restriction is simply meant to prohibit the reading of sexually explicit, graphic passages at Board meetings. [Dkt. 34 – Defs.' Post-Hr'g Br., at 6-7]. Courts have suggested that restrictions on "sexually explicit" speech may be permissible. See, e.g., Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675, 684 (1986) ("First Amendment jurisprudence has acknowledged limitations on the otherwise absolute interest of the speaker in reaching an unlimited audience where the speech is sexually explicit and the audience may include children.") (citation omitted); Iancu, 139 S. Ct. at 2301

(implying that the government's refusal to register "lewd" or "sexually explicit" trademarks would be constitutional); <u>Video Software Dealers Ass'n v. Maleng</u>, 325 F. Supp. 2d 1180, 1185 (W.D. Wash. 2004) ("Sexually-explicit materials were originally excluded from the protections of the First Amendment because the prevention and punishment of lewd speech has very little, if any, impact on the free expression of ideas and government regulation of the sexually obscene has never been thought to raise constitutional problems."); <u>McBreairty v. Sch. Bd. of RSU 22</u>, 2022 WL 2835458, at *10 n.16 (D. Me. July 20, 2022) (acknowledging same and suggesting that restriction on sexually explicit speech may be permissible where children were at the school board meeting and watched the live stream from home, but concluding that the record was not sufficiently developed to reach that conclusion definitively).  However, nowhere in the public participation policy is that term used.  Rather, the term 'profane' is used, without further definition. [6]

Accordingly, Plaintiffs are substantially likely to succeed on their facial challenge to this provision.  And because the Plaintiffs' facial challenge is successful at this stage, the Court need not address their as-applied challenge.  The

---

[6] Defendants, of course, are welcome to revise their public participation policy again if they see fit, and the Court will take up any challenges to new provisions at that time.  If Defendants choose to take this route, the Court notes that the inclusion of guideposts and definitions for certain terms, such as profane and profanity, may help to avoid future vagueness and overbreadth challenges.

Court grants Plaintiffs' motion to enjoin Defendants' enforcement of this provision.

### 6. Prohibition on Abusive Remarks

Plaintiffs also assert a facial and as-applied challenge to the public participation policy's prohibition on abusive remarks by speakers. The Court already addressed the validity of such a provision in its discussion of the public participation policy's respectfulness provision. But, to avoid any confusion or ambiguity, the Court concludes that a provision prohibiting abusive speech constitutes impermissible viewpoint discrimination and is therefore unconstitutional. See, e.g., Ison, 3 F.4th at 894 (concluding that policy prohibiting "antagonistic" and "abusive" speech "plainly fit in the broad scope of impermissible viewpoint discrimination because [] they prohibit speech purely because it disparages or offends.") (citation and quotations omitted); Marshall, 571 F. Supp. 3d at 422 (finding that the policy restrictions on the use of "abusive" and "offensive" comments were impermissible viewpoint discrimination). However, the fact that the Board cannot outright prohibit abusive speech that is simply critical or offensive does not mean that it cannot restrict certain sub-categories of that type of speech, such as hateful racial epithets. Indeed, multiple courts, including the Eleventh Circuit, have affirmed or upheld the restriction of speech at

board meetings that included "racist and hate-filled epithets," finding that such abusive speech "disrupted meeting progress" and "failed to advance any meaningful discourse." Dyer, 426 F. Supp. 3d 1350, 1357, 1369-61; see also Moms for Liberty, 582 F. Supp. 3d at 1220 (finding that exclusion of speaker from school board meeting was appropriate after he stated the Democratic party accepts "the murder of full-term babies with abortion" and believes "white babies are born racist and oppressive").

As such, Plaintiffs are substantially likely to succeed on their facial challenge to this provision. And because the Plaintiffs' facial challenge is successful at this stage, the Court need not address their as-applied challenge. The Court grants Plaintiffs' motion to enjoin Defendants' enforcement of this provision.[7]

### 7. Prohibition on Loud and Boisterous Conduct or Comments

Finally, Plaintiffs assert a facial and as-applied challenge to the public participation policy's prohibition on loud and boisterous conduct or comments by speakers or members of the audience. Specifically, they argue that the prohibition is subjective, vague, and undefined. [Dkt. 25 – Pls.' Pre-Hr'g Memo., at 8-10].

---

[7] Once again, this finding does not leave Defendants without recourse. Even though they cannot outright prohibit abusive remarks, they can nevertheless limit certain speech or comments that actually disrupt Board meetings and proceedings.

This provision can be quickly addressed. Courts have consistently held that restrictions on and prohibitions of loud and boisterous conduct or comments are permissible. See, e.g., Jones v. City of Key West, Fla., 679 F. Supp. 1547, 1559 (S.D. Fla. 1988) ("Moreover, the prohibition against loud and boisterous behavior, to the extent that such behavior is intended to disrupt a City Commission meeting, is not overbroad because that limitation is consonant with permitted time, place and manner restrictions. Clearly, there are a substantial number of situations to which the ordinance's prohibitions might be validly applied.") (citation, punctuation, and quotations omitted) (reversed on other grounds); Hunt, 2012 WL 12548355, at *6 (holding that prohibition on "disorderly or boisterous conduct, including the utterance of loud . . . language, whistling, stamping of feet or other acts which disturb" was not "on its face [] substantially and facially overbroad") (citation and quotations omitted) (citation and quotations omitted). In addition, albeit in the criminal context, this Court has previously rejected a vagueness challenge to the terms "loud" and "boisterous," holding that the terms "are easily and understandably defined" and "[t]here is nothing vague or counterintuitive in this language." U.S. v. Dyers, 2007 WL 397109, at *8 (N.D. Ga. Jan. 30, 2007) (citation and quotations omitted).[8] This Court agrees with its predecessors'

---

[8] Though this was a criminal case, the Court nevertheless finds its analysis instructive.

reasoning and finds that the prohibition on loud and boisterous conduct or comments by speakers or members of the audience is facially constitutional.[9]

Plaintiffs' as-applied challenge is a bit more nuanced. Again, the Board modified its public participation policy to prohibit loud and boisterous conduct and comments after the Board meetings in question, so this provision has technically not yet been applied to Plaintiffs. However, in Defendants' supplemental briefing, they acknowledge that the Board would have found that some of Ms. Hair's speech at Board meetings violated the loud and boisterous provision. [Dkt. 34 – Defs.' Post-Hr'g Supp. Br., at 7-8]. Defendants specifically note the point in her speech at the March Board meeting where Chair McCall gaveled and interrupted her and she yelled "Don't even," continued to read aloud, and ultimately elevated her voice to the point where Chair McCall called a recess and emptied the meeting room. [Id.]. Given this concession, the Court will consider Plaintiffs' as-applied challenge to the loud and boisterous provision to be viable. Even so, it is not at all clear to the Court that the Board applied the provision in an unconstitutional manner. Indeed, the video of the meeting makes clear that Ms. Hair raised her

_____

[9] The Court notes that the speech in question must be both loud *and* boisterous to be constitutionally restricted or limited. In other words, the Board and Chair McCall cannot limit or terminate a member of the public's speaking time simply because the speaker raised his or her voice. It is only when that speech becomes so loud and rowdy that it actually disrupts the Board's proceedings that it can be restricted.

voice significantly and members of the audience subsequently did the same, disrupting the progression of the meeting. At that point, Chair McCall's interruption could certainly be considered a reasonable application of the provision, and the Court cannot conclude that it is substantially likely that he applied the provision inconsistently.[10]

Accordingly, the Court finds that Plaintiffs are not substantially likely to succeed on their facial or as-applied challenges to the loud and boisterous provision and denies Plaintiffs' motion to enjoin Defendants' enforcement of this provision.

### B. Risk of Irreparable Harm to Plaintiff

Next, Plaintiffs must demonstrate that they will suffer irreparable harm absent a preliminary injunction. "To succeed in demonstrating a threat of irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." Powell v. Noble, 798 F.3d 690, 702 (8th Cir. 2015) (citation and quotations omitted). Plaintiffs argue that they have suffered—and, without an injunction, will continue

---

[10] However, the Court does not mean to suggest that this provision could never be applied in an unconstitutional manner. In fact, the opposite is true. Going forward, the Board must remember that this restriction should only be applied to limit or restrict speech or conduct that has actually disrupted or would actually disrupt its proceedings.

to suffer—irreparable harm by virtue of the direct penalization of their protected speech. [Dkt 2-1 – Mot. for Prelim. Inj., at 10, 24]. Defendants dispute Plaintiffs' position, generally contending that Plaintiffs have been able to express their viewpoints at Board meetings and have therefore not been irreparably harmed. [Dkt. 17 – Opp. Br., at 16-17].

The case law on this point is clear. Courts have said repeatedly and for decades that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373 (1976) (citation omitted). In addition, irreparable harm "is generally presumed where the moving party's freedom of speech right is being infringed." Marshall, 571 F. Supp. 3d at 426 (citation and quotations omitted); see also Flores v. Bennett, 2022 WL 9459604, at *15 (E.D. Cal. Oct. 14, 2022) ("In cases involving First Amendment challenges, irreparable injury is often presumed when the plaintiff demonstrates a colorable First Amendment claim. The mere threat of enforcement of an unconstitutional restriction on speech may create a chilling effect sufficient to show irreparable harm.") (citation and quotations omitted).

Here, the Court has already concluded that Plaintiffs are substantially likely to succeed on some of their claims that their First Amendment rights are being

infringed.  Accordingly, the Court finds that Plaintiffs have persuasively demonstrated that they will suffer irreparable injury if an injunction does not issue.

### C. Balance of Equities and Public Interest

Neither party spends much time discussing the last two elements, the balance of equities and the public interest.  Indeed, Plaintiffs simply argue that there is no public interest in enforcing an unconstitutional ordinance and the public interest is served when constitutional rights are protected, and Defendants counter that permitting Plaintiffs' reading of sexually explicit, graphic books at public, livestreamed Board meetings actually disserves the public.  [Dkt. 2-1 – Mot. for Prelim. Inj., at 24-25; Dkt. 17 – Opp. Br., at 17-18].

"Where the government is the opposing party, the final two factors in the [preliminary injunction] analysis—the balance of the equities and the public interest—merge." Coronel v. Decker, 449 F. Supp. 3d 274, 287 (S.D.N.Y. 2020) (citation omitted).  There is no doubt that the Board has a significant interest in conducting orderly and uninterrupted meetings and providing the opportunity for members of the public to speak at those meetings. McBreairty, 2022 WL 2835458, at *12.  But where "the plaintiffs are likely to succeed on their [First Amendment] claims, the balance of equities and the public interest favor injunctive relief." Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ., 46

F.4th 1075, 1098 (9th Cir. 2022) (citation omitted); see also, e.g., Christian Legal

Soc'y v. Walker, 453 F.3d 853, 859 (7th Cir. 2006) ("[I]njunctions protecting First

Amendment freedoms are always in the public interest.") (citations omitted);

Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms.

Co., 290 F.3d 578, 597 (3d Cir. 2002) (If the moving party demonstrates a

likelihood of success on the merits, "the public interest leans even more toward

granting the injunction.").  Moreover, "protecting rights to free speech is ipso facto

in the interest of the general public," McBreairty, 2022 WL 2835458, at *12

(citation, punctuation, and quotations omitted), and "the enforcement of an

unconstitutional law vindicates no public interest."  K.A. ex rel. Ayers v. Pocono

Mountain Sch. Dist., 710 F.3d 99, 114 (3d Cir. 2013) (citation omitted).

Here, the Court has already explained that Plaintiffs are substantially likely

to succeed on the merits at least as to several of the public participation policy

provisions.  And, obviously, Plaintiffs' First Amendment rights are at stake.

Accordingly, the Court finds that the balance of equities and public interest both

weigh in favor of granting the preliminary injunction.

### D. Rule 65(c) Bond or Security Requirement

Because the Court will grant Plaintiffs' preliminary injunction in part, it is

necessary to determine whether a bond requirement should be set.  Federal Rule of

Civil Procedure 65(c) states that "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  However, the Eleventh Circuit has established that "the amount of security required by the rule is a matter within the discretion of the trial court, and the court may elect to require no security at all."  BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC, 425 F.3d 964, 971 (11th Cir. 2005) (citation, punctuation, and quotations omitted).  And courts have consistently recognized that the bond or security can be waived "when complying with the preliminary injunction raises no risk of monetary loss to the defendant."  Zambelli Fireworks Mfg. Co. v. Wood, 592 F.3d 412, 426 (3d Cir. 2010) (citation and quotations omitted); see also Baumann v. City of Cumming, Ga., 2007 WL 9710767, at *7 n.8 (N.D. Ga. Nov. 2, 2007) ("Plaintiff is engaged in public-interest litigation and is likely to prevail on the merits of his constitutional claims.  The court's order enjoining the city and its employees does not create a risk of monetary loss.  For these reasons, the court hereby waives the security requirement set forth in Rule 65(c).") (citation omitted).

Plaintiffs argue that the Court should not require them to post a bond because they are highly likely to succeed on their claims, Defendants will not

suffer monetary damages from the injunction, the government is the defendant, and First Amendment rights are at issue. [Dkt. 2 – Mot. for Prelim. Inj., at 11, 25]. Defendants do not request a bond. There is no evidence of risk of monetary loss to Defendants from not enforcing certain of the provisions outlined in the Board's public participation policy at Board meetings. And as explained earlier, the preliminary injunction protects First Amendment rights and vindicates the public interest. Accordingly, the Court finds that waiver of the Rule 65(c) security requirement is appropriate here.

### E. Validity of Board's Permanent Ban of Ms. Hair from Meetings

Finally, having evaluated the constitutionality of the various public participation policy provisions and restrictions at issue, the Court must now assess the validity of the Board's permanent ban of Ms. Hair from its meetings. As a reminder, following the February and March Board meetings, the Board sent Ms. Hair two letters. In the first, Chair McCall stated that Ms. Hair "violated the Board's rules regarding public participation" and "refused to follow [his] instructions" or "honor [his] directives," and notified her that she was "prohibited from attending meetings of the Board of Education until such time as [she is] willing to state in writing, to [him], that [she] will follow the rules" and his directives. [Dkt. 2-4 – March 17, 2022 Letter]. And in the second, the entire

Board asserted that Ms. Hair's remarks "were not civil" and reaffirmed her prohibition from attending Board meetings until she agreed in writing to follow the rules. [Dkt. 2-5 – May 11, 2022 Letter]. Plaintiffs argue that Defendants' indefinite banning of Ms. Hair violates her right to speak and petition and is disproportionate, and that it has caused Ms. Martin to refrain from speaking at Board meetings because she fears being banned herself. [Dkt. 25 – Pls.' Pre-Hr'g Memo., at 11-12; Dkt. 27 – First Am. Compl., at ¶ 67].

The Court sees two problems with Defendants' decision to permanently ban Ms. Hair from Board meetings: it does not appear to be supported by the public participation policy, and it is an unconstitutional restriction on Ms. Hair's First Amendment rights.

First, the Board's action appears to exceed its authority under its own public participation policy. Indeed, the public participation policy that was in place at the time of the meetings gave Chair McCall the responsibility of enforcing the public participation policy and stated that "speakers who are found in violation will have their allotted speaking time immediately concluded." [Dkt. 1-3 – Public Participation Policy]. Also, it provided that the "[f]ailure to abide by this policy may result in forfeiture of the right to *participate* in future Board meetings." [Id.

(emphasis supplied)]. The revised public participation policy expounded on the

potential punishments for violation of the rules:

> Those attending a meeting or speaking during public
> participation who violate these procedures will be warned
> by the Chair. A continued violation may result in a
> speaker being asked to sit down. If any person attending
> a meeting refuses to follow these rules disrupting the
> meeting, they will be asked to leave and if they refuse, be
> escorted from the meeting room. Such serious or
> repeated violations of the rules of conduct may result in
> the individual being prohibited from speaking during a
> board meeting for an appropriate period of time. Any
> attendee violating the laws of the State while on District
> property or attending a meeting of the Board shall be
> subject to arrest by law enforcement.

[Dkt. 27-5 – Revised Public Participation Policy]. In addition, it asserts that "[n]o

individual or group will be retaliated against, in any manner whatsoever, for

speaking during public participation." [Id.]. At most, then, the policies give Chair

McCall and the Board the authority to escort a speaker out of a particular meeting

and limit or prohibit them from speaking at meetings for a certain period of time.

But they do not give Chair McCall or the Board the ability to permanently ban

members of the public from attending Board meetings or require them to affirm

that they will not break the rules before they are allowed to speak at said meetings.

But second, even if the public participation policy did purport to give the

Board the authority to enact a permanent ban, it would not likely be constitutional,

at least in this circumstance. The Court need not determine whether this ban is a time, place, and manner restriction or a content-based restriction, because it would be unconstitutional under either framework. Courts have consistently held that categorically banning individuals from open school board meetings is unreasonable and unconstitutional[11]. See, e.g., Cyr v. Addison Rutland Supervisory Union, 60 F. Supp. 3d 536, 548 (D. Vt. 2014) ("A categorical ban of a single individual from open school board meetings, however, is not narrowly tailored and does not leave open ample alternative channels of communication."); McBreairty, 2022 WL 2835458, at *11 ("Singling out one individual, banning his (perhaps disfavored) speech, and essentially preventing him from engaging in a form of civil discourse that is available to everyone else . . . is unreasonable.") (citation omitted); Stevens v. Sch. City of Hobart, 2015 WL 4870789, at *14 (N.D. Ind. Aug. 6, 2015) (holding that an "outright ban" on attending school board meetings "is not narrowly tailored to achieve" the government's interest) (citation omitted). This Court agrees. A permanent ban on Ms. Hair's attendance at Board meetings is

---

[11] The Court acknowledges that there may be situations where a permanent ban would be reasonable and appropriate, such as where the subject of the ban had committed or plausibly threatened to commit violence against a member of the Board, but those are not the facts before it at this time.

unreasonable.  And the Board cannot require Ms. Hair to first waive her First

Amendment rights in order to exercise those same rights.

Accordingly, the Court finds that Plaintiffs are substantially likely to

succeed on their challenge to the Board's permanent ban of Ms. Hair and grants

their motion to enjoin Defendants' enforcement of that ban.

## CONCLUSION

For the foregoing reasons, Plaintiffs Mama Bears of Forsyth County, Alison

Hair, and Cindy Martin's Motion for Preliminary Injunction [Dkt. 2] is

**GRANTED in part** and **DENIED in part**.

Given the number of contested provisions and the complexity of these

issues, the Court finds it prudent to summarize its findings here.  The Court finds

that Plaintiffs are substantially likely to succeed on their facial challenge to the

public participation policy's respectfulness requirement, their facial challenge to

the restriction on personally addressing Board members, their as-applied challenge

to the request to keep remarks civil, their facial challenge to the restriction on

profane remarks, and their facial challenge to the restriction on abusive remarks.

The Court also finds that Plaintiffs are not substantially likely to succeed on their

facial challenge to the public participation policy's request to keep remarks civil,

their facial or as-applied challenges to the restriction on obscene remarks, or their

49

facial or as-applied challenges to the restriction on loud and boisterous conduct or comments.

The Court therefore **ENJOINS** Defendants' enforcement of the following provisions: the respectfulness requirement, the restriction on personally addressing Board members, the request to keep remarks civil, the restriction on profane remarks, and the restriction on abusive remarks. In addition, the Court **ENJOINS** the Board's permanent ban of Ms. Hair from future Board meetings.

**SO ORDERED** this 16th day of November, 2022.

_____
**RICHARD W. STORY**
United States District Judge